407 So.2d 1150 (1981)
STATE of Louisiana
v.
Howard MATTHESON.
No. 80-KA-2082.
Supreme Court of Louisiana.
November 16, 1981.
Rehearing Denied January 25, 1982.
*1154 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise Korns, Nick Noriea, Jr., Dennis Waldron, John Craft, Asst. Dist. Attys., for plaintiff-appellee.
Clyde Merritt, and Dwight Doskey of Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
*1155 MARCUS, Justice.
Howard Mattheson and his wife, Willene I. Mattheson, were jointly indicted by the grand jury for the first degree murder of Mamie Dupaquier on March 9, 1978, in violation of La.R.S. 14:30. The state elected to try them separately and proceeded to trial on the indictment against Howard Mattheson. After trial by jury, Howard Mattheson was found guilty as charged. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant. The trial judge sentenced him to death in accordance with the recommendation of the jury. On appeal, defendant relies on seventeen assignments of error for reversal of his conviction and sentence.

FACTS
At about 4:30 p. m. on March 9, 1978, defendant and his wife entered the Hair-Wiz beauty salon on Canal Street in New Orleans where eight days earlier (March 1), defendant had had his hair washed and cut and his fingernails manicured. Defendant was armed with a double-barreled sawed-off shotgun. The first person they encountered was Mamie Dupaquier, a 75-year-old woman employed at the salon as a receptionist. Almost immediately, Ms. Dupaquier was shot in the head by defendant. The blast tore away most of her skull and brain tissue resulting in her death. According to the assistant coroner, the victim was shot at "[c]lose range, not more than a foot or two."
The rest of the 20 to 25 people in the salon were located in the main area which was situated several feet higher than the reception area. Following the shooting, defendant ran up the few stairs and commanded everyone to lie down on the floor. He informed them that he had just killed one lady and would kill again if his orders were not followed. Defendant told an employee of the salon to tape everyone's hands behind their backs. The tape was furnished to the employee by defendant. He then reloaded his gun and, with the help of his wife, began searching all of the women's purses. He stated that if he found any guns he would kill the owner with her gun. One woman refused to surrender her purse and told defendant that he would have to kill her first. Defendant responded that instead of killing her, he would shoot the woman next to her. Immediately thereafter, he shot Ms. Laura McGoey, who was lying next to the woman with the purse, in the leg.
In the midst of all this confusion, three more customers tried to enter the salon. Mrs. Mattheson let them in through the locked front door and defendant told them to give him their purses. He repeated his warning that this was not a joke, that one lady had already been killed and that he would not hesitate to kill anyone else. After collecting the money and other valuables from the purses and cash register, defendant and his wife fled the scene. Prior to their departure, defendant and his wife each ripped one of the two telephones off the wall. The couple returned to their apartment located in the vicinity where they changed their clothes before going to a nearby restaurant for dinner.
Police investigating the murder and armed robberies were informed that two people fitting the description of the Matthesons were staying in a boarding house in the vicinity. There, the police learned that the suspects had just inquired about a good place to eat in the area. The officers checked several nearby restaurants and discovered defendant and his wife seated at a table in Ponsaa's restaurant. When the plain-clothed detectives entered the restaurant, the Matthesons became suspicious and Mrs. Mattheson hurried into the restroom. At this point, defendant was arrested and searched. When Mrs. Mattheson exited the restroom, she was also arrested. A search of the restroom turned up evidence in the garbage can. Later that evening, a warrant was issued to search the Matthesons' apartment. Evidence, including the shotgun, was found as a result of that search.
At trial, defendant testified that he was intoxicated and on drugs (LSD) on the day *1156 in question (March 9). He admitted having planned and committed the armed robberies but stated that he never intended to kill the receptionist. He further testified that Ms. Dupaquier had pulled the shotgun, as if she did not believe it was real, and it accidentally discharged. He also contended that the shooting of Ms. McGoey was accidental.

ASSIGNMENTS OF ERROR NOS. 1 AND 9
Defendant contends the trial judge erred in denying his motion to quash grounded on the claim that La.Code Crim.P. art. 905.4(g) as applied to the statutory scheme of first degree murder (La.R.S. 14:30) and second degree murder (La.R.S. 14:30.1) permitted the state to introduce evidence of an aggravating circumstance, that is, the offense was committed in an especially heinous, atrocious or cruel manner, during the guilt-innocence phase of the trial. He argues that that made the offense for which he was charged, first degree murder, unconstitutional (Assignment of Error No. 1). He further contends the trial judge erred in excluding from the jury charge section B of La.R.S. 14:30.1 because it denied him the opportunity to have the jury return a second degree murder verdict under that definition (Assignment of Error No. 9).
At the time defendant committed the charged offense, the statutes of first degree murder (La.R.S. 14:30) and second degree murder (La.R.S. 14:30.1) provided as follows:
La.R.S. 14:30. First Degree Murder
First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury.
La.R.S. 14:30.1. Second Degree Murder
Second degree murder is:
A. The killing of a human being when the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill; or
B. The killing of a human being when the offender has a specific intent to kill, under circumstances that would be first degree murder under Article 30, but the killing is accomplished without any of the aggravating circumstances listed in Article 905.4 of the Louisiana Code of Criminal Procedure.
Whoever commits the crime of second degree murder shall be imprisoned at hard labor for life and shall not be eligible for parole, probation, or suspension of sentence for a period of forty years.
Section 2. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items or applications of this Act which can be given effect without the invalid provisions, items or applications, and to this end the provisions of this Act are hereby declared severable.
Section 3. All laws or parts of laws in conflict herewith are hereby repealed.
La.Code Crim.P. art. 905.4, referred to in La.R.S. 14:30.1(B), provides:
The following shall be considered aggravating circumstances:
(a) The offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, or armed robbery;
(b) The victim was a fireman or a peace officer engaged in his lawful duties;
(c) The offender was previously convicted of an unrelated murder, aggravated rape, or aggravated kidnapping;
(d) The offender knowingly created a risk of death or great bodily harm to more than one person;
(e) The offender offered or has been offered or has given or received anything of value for the commission of the offense;

*1157 (f) The offender at the time of the commission of the offense was imprisoned after sentence for the commission of an unrelated forcible felony;
(g) The offense was committed in an especially heinous, atrocious or cruel manner.
In State v. Payton, 361 So.2d 866 (La. 1978), decided one month after defendant's trial, we were confronted with the same contention as presented here. We held that, although section B of La.R.S. 14:30.1 had the effect of redefining first degree murder as a specific intent homicide accomplished with a statutorily prescribed aggravating circumstance, sections (c), (f) and (g) of La.Code Crim.P. art. 905.4 were to be excluded from the murder definitions so as to prevent improper considerations by the jury during the guilt-innocence phase of the trial. However, the jury was to consider all seven of the aggravating circumstances during the sentencing hearing.
In the instant case, the trial judge, faced with the dilemma presented by the aforesaid statutory scheme, chose not to include the aggravating circumstances of La.Code Crim.P. art. 905.4 in the definition of first degree murder and to exclude section B of La.R.S. 14:30.1 from the definition of second degree murder. Rather, the jury was only charged that first degree murder was "the killing of a human being with the offender has the specific intent to kill or inflict great bodily harm." This had the effect of excluding La.Code Crim.P. art. 905.4(g) from the definition of first degree murder. Moreover, the only evidence introduced at trial relating to the heinous manner in which the offense was committed was descriptions by a police officer and the assistant coroner of the victim after being shot. Their testimony indicated the shotgun blast tore away most of the victim's skull and brain tissue. This evidence was relevant to prove the specific intent of defendant by showing the close range at which the gun was fired. Photographs introduced at trial were clearly not gruesome. Under the circumstances, defendant was not prejudiced. Assignment of Error No. 1 is without merit.
Defendant further contends that it was error for the trial judge to exclude section B of La.R.S. 14:30.1 from the jury charge because it denied him the opportunity to have the jury return a second degree murder verdict under that definition (Assignment of Error No. 9).
We find no substance in this contention because La.R.S. 14:30.1(B) defines second degree murder as a murder that would otherwise be first degree murder but is accomplished without any of the aggravating circumstances listed in La.Code Crim.P. art. 905.4. One of the aggravating circumstances listed in art. 905.4 provides "[t]he offender was engaged in the perpetration or attempted perpetration of ... armed robbery." La.Code Crim.P. art. 905.4(a). Defendant himself testified to the fact that he was committing an armed robbery. Hence, the jury could not properly have returned a second degree murder verdict under La.R.S. 14:30.1(B) because the killing was accomplished with one of the aggravating circumstances. Therefore, the omission of this provision from the jury charge did not prejudice defendant.[1] Assignment of Error No. 9 is without merit.

ASSIGNMENT OF ERROR NO. 2
Defendant contends the trial judge erred in denying his motion to suppress physical evidence. The evidence was seized (1) from defendant as a result of being searched after his arrest at Ponsaa's restaurant, (2) from the garbage can in the restaurant's restroom after defendant's wife had exited therefrom, and (3) from the apartment where the couple was residing at the time.
This assignment of error was neither briefed nor argued; therefore, we consider it to have been abandoned. State v. Blanton, 325 So.2d 586 (La.1976); State v. Carlisle, 315 So.2d 675 (La.1975).
*1158 In any event, it is without merit. It is well settled that a search conducted without a warrant issued upon probable cause is per se unreasonablesubject only to a few specifically established and well-delineated exceptions. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). One of these exceptions is a search incident to a lawful arrest made of a person in the area in his immediate control. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); State v. Wichers, 392 So.2d 419 (La.1980).
At the suppression hearing, Sergeant Malcolm Cheramie testified that he had received a description of the suspects from several witnesses at the Hair-Wiz beauty salon and had learned from the manager of a nearby apartment that a couple fitting the description of the suspects resided there under the name of Mattheson. The officer further testified that the manager told him that about fifteen minutes earlier the couple inquired about a place to eat in the vicinity and he had suggested Ponsaa's restaurant. After receiving this information, Cheramie dispatched two police officers to Ponsaa's. These officers reported that individuals fitting the description of the suspects were seated at a table in Ponsaa's. We conclude that ample probable cause existed prior to the arrest of defendant. Accordingly, since the arrest was valid, the seizure of the evidence from his person was permissible as incident to a lawful arrest.
There is no constitutional prohibition against seizure of abandoned property by the police. State v. Ryan, 358 So.2d 1274 (La.1978). Nor is a search warrant required for the seizure of such property. In the instant case, the evidence recovered from the garbage can in the restaurant's restroom from which defendant's wife had just exited was clearly abandoned and thus subject to seizure.
La.Code Crim.P. art. 162 provides that a search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant. In the instant case, the affidavit details the facts of the investigation leading to the arrest of defendant and his wife and their later identification by witnesses at the scene of the crimes. Clearly, the affidavit established probable cause to justify the issuance of the warrant. Therefore, the evidence seized from the Matthesons' apartment was validly obtained.
In sum, the trial judge correctly denied defendant's motion to suppress the physical evidence. Assignment of Error No. 2 is without merit.

ASSIGNMENTS OF ERROR NOS. 3 AND 4
Defendant contends the trial judge erred in overruling his objections to the allowance of the state of challenges for cause of three prospective jurors due to their sentiments regarding the death penalty. Defendant argues that the exclusion of this class of persons from the jury violates his constitutional right to be tried before a jury composed of a fair cross-section of the community.
The record reveals that the state used only eight of the twelve peremptory challenges allowed by law under the provisions of La.Code Crim.P. art. 799. Hence, even if we were to determine that the trial judge improperly sustained the state's challenges, defendant would be entitled to no relief. It is well settled that the erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than he is entitled to by law. La.Code Crim.P. art. 800; State v. Labostrie, 358 So.2d 1243 (La.1978); State v. George, 346 So.2d 694 (La.1977); State v. Ross, 343 So.2d 722 (La.1977); State v. Skelton, 340 So.2d 256 (La.1976).
In any event, there is no merit to defendant's contention. A review of the voir dire examination reveals that the excluded *1159 prospective jurors stated in advance of trial that they could not consider returning a verdict of death. Therefore, the jurors were properly excused in compliance with La.Code Crim.P. art. 798(2)[2] and Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[3]
There is no merit to defendant's contention that his constitutional right to be tried by a jury selected from a fair cross-section of the community has been violated when the prospective jurors have been properly excluded in compliance with La.Code Crim.P. art. 798(2) and Witherspoon v. Illinois, supra, as was done here. State v. Kelly, 375 So.2d 1344 (La.1979).
Assignments of Error Nos. 3 and 4 are without merit.

ASSIGNMENT OF ERROR NO. 5
Defendant contends the trial judge erred in allowing testimony during the guilt-innocence phase of the trial of events that occurred after the murder in order to establish that the murder was committed in a heinous, atrocious or cruel manner. He argues that the purpose of the testimony concerning the armed robberies and the shooting of Ms. McGoey was to show that the aggravating circumstance of La.Code Crim.P. art. 905.4(g) was present.
There is no merit to this contention. Facts after the murder were not relevant to whether the offense was committed in an especially heinous, atrocious or cruel manner. Rather, they were relevant to prove the specific intent of defendant to kill the victim and to negate the defenses of intoxication and accident.
Assignment of Error No. 5 is without merit.

ASSIGNMENT OF ERROR NO. 6
Defendant contends the trial judge erred in allowing "excessive evidence" to show that the murder was committed in the course of an armed robbery, a fact which he willingly admitted.
This assignment of error was neither briefed nor argued; therefore, we consider it to have been abandoned. State v. Blanton, 325 So.2d 586 (La.1976); State v. Carlisle, 315 So.2d 675 (La.1975).
In any event, it is without merit. The trial judge allowed evidence to show the armed robberies despite defendant's admission. Defendant cannot control the state's method of proof. In a criminal prosecution, the state has the burden of proving each element of the crime beyond a reasonable doubt. La.R.S. 14:30 then defined first degree murder as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Evidence of defendant's conduct at the time of the murder was relevant to negate the defense that his intoxicated and drugged condition precluded the presence of a specific criminal intent. Moreover, circumstances of the armed robberies were part of one continuous transaction. Therefore, they were part of the res gestae. La.R.S. 15:448. What forms part of the res *1160 gestae is always admissible in evidence. La.R.S. 15:447; State v. Matthews, 354 So.2d 552 (La.1978). A defendant may not exclude from the jury's consideration relevant evidence concerning a crime merely by offering to stipulate. Hence, the trial judge did not err in allowing evidence of the armed robberies despite defendant's admission.
Assignment of Error No. 6 is without merit.

ASSIGNMENT OF ERROR NO. 7
Defendant contends the trial judge erred in not granting his wife, Willene I. Mattheson, use immunity when she invoked her fifth amendment privilege against self-incrimination after being called as a defense witness. He argues that his constitutional rights of compulsory process and due process were violated by the denial of his request because his wife possessed exculpatory evidence crucial to his defense.
There is no statutory authority for a Louisiana court to grant a defense witness use immunity absent a request from the attorney general together with the district attorney for the district in which the proceeding is or may be held. La.Code Crim.P. art. 439.1.[4] Therefore, any judicially-fashioned immunity must arise from the constitutional guarantees of compulsory process or due process.
Claims for defense witness use immunity have been uniformly rejected by almost all of the federal circuit courts of appeals that have considered the matter. United States v. Turkish, 623 F.2d 769 (2d Cir. 1980), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800, and cases cited therein.[5]
We do not consider that the sixth amendment supports a claim for defense witness immunity. Traditionally, the sixth amendment's compulsory process clause gives defendant the right to bring his witness *1161 to court and have the witness' non-privileged testimony heard, but does not carry with it the traditional right to displace a proper claim of privilege, including the privilege against self-incrimination. United States v. Turkish, supra; United States v. Lenz, 616 F.2d 960 (6th Cir. 1980), cert. denied, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124. Nor has section 16 of article 1 of the Louisiana Constitution of 1974 been construed to grant such a right.
Additionally, we do not consider that the due process clause requires that defense witness immunity must be ordered whenever it seems fair to grant it. The essential fairness required by the fifth amendment guards the defendant against overreaching by the prosecutor and insulates him against prejudice. It does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges. United States v. Turkish, supra.
In the instant case, the defense witness (Mrs. Mattheson) was the subject of pending prosecution for armed robbery and first degree murder. We consider that a trial judge properly rejects a claim for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution. Hence, the trial judge correctly denied defense witness immunity in this case.
Assignment of Error No. 7 is without merit.

ASSIGNMENT OF ERROR NO. 8
Defendant contends the trial judge erred in allowing a question to whether he had made any statement to the police officer at the time of his arrest. He argues that the question constituted a prohibited comment on the exercise of his right to remain silent.
Defendant took the stand in his own behalf and testified that he had consumed about a quart of liquor and was on drugs on the day of the offense. Upon cross-examination of defendant, the following colloquy took place:
Q. At the time the police arrested you, were you still drunk, or whatever you were?
A. Yes, sir, I wasI had quite a bit. I drank some when I went home, too. After the robbery.
Q. Okay, when the police arrested you did you tell them you were intoxicated?
Defense counsel objected. The court overruled the objection, but the state withdrew the question and the answer was never given by defendant.
The use for impeachment purposes of defendant's silence, at the time of his arrest after receiving his Miranda warnings, violates his due process rights. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); State v. Montoya, 340 So.2d 557 (La.1976); State v. Smith, 336 So.2d 867 (La.1976). However, in State v. Mosley, 390 So.2d 1302 (La.1980), we found that an oblique and obscure reference to a defendant's post-arrest silence did not amount to reversible error as the defendant did not suffer any prejudice as a result thereof. In the instant case, in light of the state's withdrawal of the question and the fact that no answer was given by defendant, we cannot say that the question, albeit improper, resulted in prejudice to defendant.
Assignment of Error No. 8 is without merit.

ASSIGNMENT OF ERROR NO. 10
Defendant contends the trial judge erred in his instruction to the jury on intent. He argues that the charge impermissibly shifted the burden of proof to him to show that he lacked the requisite criminal intent.
The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Accordingly, the state cannot shift to the defendant the burden of disproving an element of the crime charged by use of a conclusive presumption or by shifting the burden of persuasion. Sandstrom v. Montana, 442 *1162 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).[6]
The issue presented is whether the challenged jury instruction had the effect of shifting the burden of proof. The instruction is as follows:
A specific intent to kill may be implied where there are no external signs of the intent beyond the mere fact of the homicide itself, if there were no just grounds for the killing, when the killing was without provocation or upon so slight a provocation as not to justify the killing.
This instruction merely sets out a permissive inference that intent to kill may be implied under certain circumstances. It leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof to defendant to prove he did not have the requisite criminal intent. Hence, the jury instruction concerning intent does not present a Sandstrom violation.
Assignment of Error No. 10 is without merit.

ASSIGNMENT OF ERROR NO. 11
Defendant contends the trial judge erred in allowing the state to "overreach" during closing argument.
The prosecutor made the following remarks:
The law of Louisiana is that if a person was so intoxicated, so drugged at the time of the commission of the offense, that it could be presumed that he could not have formed specific intent, then he can't be found guilty of first degree murder. You can only find him guilty of second degree murder. So, Number one, I didn't mean to do it, I had no intention to kill her, so find me guilty of second degree. But if you don't buy that, and you say I had specific intent, I must have wanted to kill her, well, believe that I was so drunk, so drugged, that in my mind, under the law, I couldn't have formed the specific intent. Then you've still got to find me guilty of second degree. And I can continue to do what Mrs. Dupaquier cannot continue to do: wake up each morning and draw a breath.
Defendant objected. The trial judge overruled the objection.
Defendant neither briefed nor argued this assignment of error; therefore, we consider it to have been abandoned. State v. Blanton, 325 So.2d 586 (La.1976); State v. Carlisle, 315 So.2d 675 (La.1975).
In any event, it is without merit. La. Code Crim.P. art. 774 sets forth the scope of closing argument:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
The prosecutor's remarks urged the jury not to accept the defense offered in the case (no specific intent to kill and intoxication precluding the presence of specific intent) as it would result in finding defendant guilty of second degree murder rather than first degree murder. This would allow defendant, unlike Mrs. Dupaquier, to escape with his life.
We do not consider that these remarks improperly appealed to prejudice. The remarks were within the scope of closing argument. Moreover, even in the event of improper argument, we would not set aside a verdict unless we were thoroughly convinced that the jury was influenced by the remarks and that they contributed to *1163 the verdict. State v. Simms, 381 So.2d 472 (La.1980). Such was clearly not the case here.
Assignment of Error No. 11 is without merit.

ASSIGNMENT OF ERROR NO. 12
Defendant contends the trial judge erred in allowing the jury to keep the indictment with it during deliberation. He argues that the very presence of such a document lent credibility to the state's case.
After the jury retired for deliberation, defendant became aware that the jury was allowed to take the indictment with it into the jury room. The trial judge refused defendant's request to have the document retrieved. Defendant's motion for a mistrial was likewise denied.
La.Code Crim.P. art. 765, in designating the normal order of trial, lists reading of the indictment, reading of defendant's plea on arraignment, and the opening statements of the state and of the defendant prior to the "presentation of the evidence." La.Code Crim.P. art. 793 provides that the jury shall not have access to any "written evidence." It also allows at the court's discretion the examination of any object or "document received in evidence."
We do not consider that an indictment is "written evidence." Hence, art. 793 does not specifically exclude it from the jury room. Even if the indictment were considered to be a "document received in evidence," the court would have discretion to permit the jury to examine it. Moreover, the jury was instructed that an indictment
... is a mere accusation or charge against the defendant. It is not evidence of the defendant's guilt, and the fact that... [i]t has been filed is of no weight and does not carry any presumption of guilt, and you must not be influenced by it in considering the case. It has no probative value whatsoever.
Under the circumstances, defendant was in no way prejudiced by retention of the indictment by the jury during its deliberation.
Assignment of Error No. 12 is without merit.

ASSIGNMENT OF ERROR NO. 13
Defendant contends the trial judge erred in allowing evidence of his prior convictions at the sentencing phase of the trial. He argues that the convictions were irrelevant as an anticipatory rebuttal of his good character. He argues that the documents introduced in evidence do not reveal whether or not he was represented by counsel or had waived same.
During the sentencing phase of the trial, the state introduced properly certified documents showing that defendant had been previously convicted of three robberies and an aggravated assault.[7] The documents do not reveal whether or not defendant was represented by counsel or had waived same. Defendant's objection to the introduction of the prior convictions in evidence was overruled by the trial judge.
La.Code Crim.P. art. 905.2 provides:
The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender. The hearing shall be conducted according to the rules of evidence. Evidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue. Insofar as applicable, the procedure shall be the same as that provided for trial in the Code of Criminal Procedure. The jury may consider any evidence offered at the trial on *1164 the issue of guilt. The defendant may testify in his own behalf. In the event of retrial the defendant's testimony shall not be admissible except for purposes of impeachment.
The above article clearly provides that the focus of the sentencing hearing is on the "character and propensities of the offender" as well as the circumstances of the offense and that evidence of "aggravating or mitigating circumstances" are relevant irrespective of whether defendant places his character at issue. Hence, there is no merit to defendant's contention that the prior convictions were irrelevant.
Nor do we find any merit in defendant's related argument that the trial judge erred in permitting introduction of the prior convictions without a showing by the state that defendant was represented by counsel or had waived same. In Lewis v. United States, 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), the United States Supreme Court recognized that while uncounseled felony convictions could not be used for certain purposes, the Court stated that it had "never suggested that an uncounseled conviction was invalid for all purposes." In the instant case, the prior convictions were used in the sentencing phase of the trial. The convictions were not being used to enhance punishment; rather, defendant's past criminal history was merely a part of the total picture of his "character and propensities." It did not of itself trigger added penalties. Hence, we do not consider the sentencing hearing to be one of those instances where the state is required to affirmatively show that defendant was represented by counsel or had waived same before a prior conviction may be used to show the character and propensities of the defendant.
In any event, we do not consider that defendant was prejudiced in the eyes of the jury by this information in view of his own testimony during the guilt-innocence phase of the trial. He testified that he was a parole violator from Florida, that he carried a sawed-off shotgun in a concealed manner and was on drugs on the day the homicide was committed. Moreover, he candidly admitted that he had committed the armed robberies at the time of the killing. Hence, the jury was fully apprised that defendant was a law violator through his own testimony.
In sum, we conclude that the trial judge did not err in allowing introduction in evidence of defendant's prior convictions without proof by the state that defendant was represented by counsel or had waived same.
Assignment of Error No. 13 is without merit.

ASSIGNMENT OF ERROR NO. 14
Defendant contends the trial judge erred in not granting his wife use immunity during the sentencing phase of the trial.
During the sentencing phase of the trial, defendant called his wife as a witness. She invoked her privilege against self-incrimination to questions whose answers would incriminate her. As discussed in Assignment of Error No. 7, a Louisiana court has no statutory authority to grant a witness use immunity except when requested to do so by the attorney general and district attorney. Moreover, we found no constitutional requirement that a claim for defense witness immunity be granted by the court. Since we see no difference between the granting of defense witness immunity at the guilt-innocence phase and the sentencing phase of the trial, we find that the trial judge correctly denied defendant's claim for defense witness immunity.
Assignment of Error No. 14 is without merit.

ASSIGNMENT OF ERROR NO. 15
Defendant contends the trial judge erred in allowing the prosecutor to refer to the fact of appellate review of the death penalty. He argues that the effect was to diminish the jury's role in the sentencing process.
In closing argument during the sentencing phase of the trial, the prosecutor stated:
[W]hat we are now asking you to do is not put this man in the electric chair, not pull a switchwe are only asking that *1165 you come back and recommend that the death penalty be imposed. I want to make that perfectly clear. If that recommendation is made by you twelve citizens of this city, the Supreme Court of this State will have[Objection]
And after full scrutiny by the Supreme Court of the State, it's up to the governor of the State to sign a warrant for the death of this man. So if that's bothering anybody, that particular aspect[Objection]
Put that aside, because the very paper that you're going to return when the judge presents it to you, the exact language, as required by law, is that "we the jury recommend" death or life. It's a recommendation by you. Now, if your recommendation is life, that's it. That would be the sentence. If it's death, it will be subjected, as it should be, rightly so, to a complete review throughout the criminal justice system. Because as somebody else said, it's no laughing matter, and that's correct. It's the most serious matter you could ever deal with within the framework of our criminal justice system. So every possible right for that defendant up till this point and into the future are going to be closely watched, monitored, scrutinized, and protected to the utmost, as they have been up until this very moment.
Defendant objected on the ground that the argument presumed "that each of the officials of the State will do their duty on the recommendations of a jury." The objection was overruled. Later, in the state's rebuttal argument, the prosecutor stated:
Well, let me put you at ease. The Supreme Court will review this entire sentencing proceeding, and if the Supreme Court thinks that his honor has made an error, the Supreme Court will send it back for another sentencing hearing before another twelve people.
In State v. Berry, 391 So.2d 406 (La.1980), a similar contention was made as the one presented in this assignment of error. On application for rehearing, we stated in a per curiam that:
Any prosecutor who refers to appellate review of the death sentence treads dangerously in the area of reversible error. If the reference conveys the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one, or if the reference contains inaccurate or misleading information, then the defendant has not had a fair trial in the sentencing phase, and the penalty should be vacated.
But virtually every person of age eligible for jury service knows that death penalties are reviewed on appeal. There is no absolute prohibition against references to this fact of common knowledge, and this court should not impose an absolute prohibition, since such a reference does not necessarily serve to induce a juror to disregard his responsibility. [Footnote omitted.] The issue should be determined in each individual case by viewing such a reference to appellate review in the context in which the remark was made.
In the instant case, we do not consider that the above remarks of the prosecutor conveyed the message that the jurors' responsibility was lessened by the fact that their decision was reviewable by this court. Nor did the remarks contain any inaccurate or misleading information. Hence, the remarks did not deprive defendant of a fair trial in the sentencing phase.
Assignment of Error No. 15 is without merit.

ASSIGNMENT OF ERROR NO. 16
Defendant contends the trial judge erred in imposing a sentence of death as not all three aggravating circumstances found by the jury were present.
The jury based its recommendation that a sentence of death be imposed on a finding of three aggravating circumstances: defendant was engaged in the perpetration of an armed robbery,[8] the offender knowingly created a risk of death or great bodily harm *1166 to more than one person,[9] and the offense was committed in an especially heinous, atrocious or cruel manner.[10]
La.Code Crim.P. art. 905.3 provides:
A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed. The jury shall be furnished with a copy of the statutory aggravating and mitigating circumstances.
The above article has been interpreted by this court to mean that if the jury finds more than one statutory aggravating circumstance and one is clearly supported by the record, it is unnecessary to overturn the sentence because one (or more) of the additional statutory aggravating circumstances are not supported. State v. Monroe, 397 So.2d 1258 (La.1981); State v. Williams, 383 So.2d 369 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828; State v. Martin, 376 So.2d 300 (La.1979), cert. denied, 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297.
In the instant case, the evidence clearly supports a finding that defendant was engaged in the perpetration of armed robbery when the victim was murdered. Defendant admitted having planned and committed the armed robberies. He also identified the shotgun used by him in the commission of the crimes. The shotgun had been recovered from his apartment after the crimes. Several victims of the robberies identified defendant as the person who had taken money and other things of value from them by use of force and intimidation while armed with a shotgun. They also identified the shotgun as the one used by defendant during the commission of the crimes.
The jury properly found that at least one statutory aggravating circumstance existed, that is, defendant was engaged in the perpetration of armed robbery when the victim was murdered; therefore, we consider it unnecessary to inquire whether the jury correctly found that the other aggravating circumstances existed.
Assignment of Error No. 16 is without merit.

ASSIGNMENT OF ERROR NO. 17
Defendant contends the trial judge erred in denying his motion for a new trial grounded on a claim that the state suppressed material evidence supportive of his intoxication defense.
At the sentencing hearing, defendant made an oral motion for a new trial based "on reasons discussed in chambers." The trial judge responded: "On the errors during the trial of this matter to which objections were made." The judge noted that having "previously ruled on those matters at trial and finding no reason to change its rulings at this point, I will deny ... the oral motion for a new trial." He allowed defendant time to file a written motion. After waiving the delay provided by law, the court sentenced defendant to death in accordance with the recommendation of the jury. At a subsequent hearing to receive objections to the Uniform Capital Sentence Report, defendant moved to amend his motion for a new trial to assert that the state had knowledge of empty vodka bottles in defendant's apartment which would have been supportive of his intoxication defense. The record does not indicate that the trial judge ruled on defendant's request to amend his motion for a new trial which had previously been denied.
The record does not reveal that any written motion for a new trial was ever filed. Moreover, defendant has neither briefed nor argued this assignment of error; therefore, we consider it to have been abandoned. In any event, assuming this to be a claim for a new trial grounded on newly-discovered evidence under La.Code Crim.P. *1167 art. 851(3),[11] it is without merit. Defendant was obviously in a position to know that there were empty vodka bottles in his apartment. At trial, he testified that he had been drinking about a quart of vodka a day for nine days prior to and including the day of the crime. He further stated that he also drank some liquor at home after the crime. Additionally, one of the photographs of defendant's apartment (S-29), admitted in evidence and viewed by the jury, prominently displays an empty liquor bottle. This photograph corroborated defendant's testimony concerning his intoxication.
Under the circumstances, we conclude that the evidence should have been discovered before or during trial. Moreover, this evidence was not so material that it would have produced a different result from the verdict reached. Finally, there is no merit to defendant's contention that the evidence was suppressed by the state. Nor can it be said that the omitted evidence would create a reasonable doubt that did not otherwise exist after evaluating the omission in the context of the entire record. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
In sum, we conclude that the trial judge did not abuse his discretion in denying defendant's motion for a new trial.
Assignment of Error No. 17 is without merit.

SENTENCE REVIEW[12]
Article 1, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.Code Crim.P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La.Sup.Ct.R. 28, § 1, which provides:
Review Guidelines. Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
(a) Passion, prejudice or any other arbitrary factors
There is no evidence that defendant's sentence was imposed under the influence of passion, prejudice or any other arbitrary factors. Moreover, we note both defendant and his victim are white.
(b) Statutory aggravating circumstances
The jury in its verdict found the following statutory aggravating circumstances:
(1) The offender was engaged in the perpetration of an armed robbery.

*1168 (2) The offender knowingly created a risk of death or great bodily harm to more than one person.
(3) The offense was committed in an especially heinous, atrocious or cruel manner.
Armed robbery is the theft of anything of value from the person of another or which is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. In our view, the evidence amply supports the jury's finding that defendant was engaged in the perpetration of an armed robbery. Accordingly, it is unnecessary for us to consider the sufficiency of the evidence for the other two statutory circumstances found by the jury.
(c) Proportionality to the penalty imposed in similar cases
Supreme Court Rule 28, § 4 provides that the district attorney shall file with this court a list of each first degree murder case in the district in which sentence was imposed after January 1, 1976. The list shall include the docket number, caption, crime convicted, sentence actually imposed and a synopsis of the facts in the record concerning the crime and the defendant. In the instant case, the list reveals that there have been seventy-seven first degree murder prosecutions in Orleans Parish. Fifty-one resulted in verdicts of first degree murder. Of these fifty-one, five defendants, including Howard Mattheson, received the death penalty.[13] In twenty-six of the seventy-seven prosecutions, the murder occurred in the course of an armed robbery. Of these twenty-six, three, including Howard Mattheson, were sentenced to death. However, the youthfulness of the defendant and lack of significant prior criminal history were factors in at least seventeen cases (the other six non-death sentence cases contain no information as to age or previous crimes). Thus, in the cases most similar to defendant's, considering particularly age and prior criminal history of the defendant, the same penalty was imposed. Moreover, in the instant case, defendant planned the armed robberies well in advance of the day on which the crimes were committed. He held some 25 women captive and threatened them with death during the course of the robberies. He senselessly shot one victim in the leg because the lady next to her had refused to surrender her purse. Finally, he committed the armed robberies while armed with a double-barreled sawed-off shotgun loaded with buckshot.
According to the Uniform Capital Sentence Report, defendant is a fifty-four year old white male. His prior work record reveals that he held numerous odd jobs since the 1950's including working as a cook in 1967 and a patient care technician in 1977. The defendant has a criminal record dating back to 1942, including three armed robbery convictions. The most recent robbery conviction occurred in 1967 in Florida and the defendant received a sentence of life imprisonment. Defendant was paroled in 1977 and was a fugitive from parole supervision at the time of the murder. He has been married since 1977 but has no children. His intelligence is estimated at a medium level, with an I.Q. of 87. No psychiatric evaluation was performed in this case, though in the past the defendant has been determined to have a passive-aggresive personality disorder and was classified as a psychopathic personality.
After having considered the above factors, we are unable to conclude that the sentence imposed in the instant case is disproportionate to the penalty imposed in other cases, considering both the crime and the defendant.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed.
*1169 CALOGERO, Justice, dissenting.
I agree with the majority disposition of the assignments of error relative to defendant's trial on the merits, with one exception: the treatment of assignment of error number 7 which brings into question whether defendant was entitled to use immunity for a defense witness. For reasons expressed hereinafter I would reserve judgment on affirming defendant's conviction until after the trial judge can conduct an evidentiary hearing concerning the testimony of the witness Willene Mattheson. That testimony, of which defendant was deprived at trial, and the substance of which is still not known, may well have affected the jury verdict in either the guilt or sentencing phases of defendant's trial.
To be successful in obtaining a conviction for first degree murder, the state had to prove, beyond a reasonable doubt, that Howard Mattheson had the specific intent to kill Ms. Dupaquier when the fatal shot was discharged. Defendant attempted to rebut the state's case by proving: (1) that he was intoxicated and on drugs at the time of the shooting and therefore could not have formed the specific intent to kill, and (2) that the shotgun accidentally discharged when Ms. Dupaquier attempted to pull the gun from him. He attempted to establish his defense with the testimony of the only live witness in the immediate vicinity of the shooting other than himself, namely, his wife Willene Mattheson. However, when Mrs. Mattheson was called to the stand as a defense witness and questioned, she refused to testify and asserted her Fifth Amendment privilege against self-incrimination, contending that her testimony might be used against her in her own pending trial for the same offense. Defendant was convicted of first degree murder and on recommendation of the jury was sentenced to death. On appeal, he asserts seventeen assignments of error, thirteen from the guilt phase and four from the sentencing phase. Among the guilt phase assignments is the contention that the trial court erred in denying him his Sixth Amendment right to present a defense by not compelling Mrs. Mattheson to testify where she was the only witness able to support Mattheson's defense.
The following facts were adduced at trial. On March 9, 1978, at approximately 4:30 p. m. defendant and his wife entered the Hair Wiz beauty salon. Defendant was armed with a double barrel sawed-off shotgun. There were twenty to twenty-five people in the salon when defendant and his wife entered. Defendant first encountered the salon receptionist, a Ms. Mamie Dupaquier. A shot was fired from defendant's shotgun, whether accidentally or intentionally, killing Ms. Dupaquier. She died several hours later in Charity Hospital.
Following the shooting, defendant ordered everyone in the salon to get on the floor, threatening to blow their heads off if they did not follow his orders. He had one of the employees tape everyone's hands together and he and his wife went through all of the women's purses. When one woman refused to give up her purse telling the defendant he would have to kill her first, defendant replied that he would not kill her but would instead shoot the woman next to her. At that moment another shot was fired, striking a Ms. McGoey in the leg. After collecting all the valuables and cash from the purses and cash register, defendant and his wife left the salon. They were arrested later that day in Ponsaa's Mid-City Restaurant located a short distance from the beauty salon.
Defendant took the stand in his own defense and asserted that on the day of the crime he had consumed one and one-half quarts of liquor and a tab of L.S.D. He admitted that he entered the salon armed with the shotgun but asserted that he had no intention of committing murder. He stated that he only intended to rob the salon and its patrons. Defendant testified that Ms. Dupaquier pulled on the shotgun, causing it to discharge accidentally. Defendant further testified that the shooting of Ms. McGoey in the leg was also accidental.
After a guilty verdict was returned and the sentencing phase of the trial completed, *1170 the jury returned a recommendation for the death penalty. Of the guilt phase assignments, I consider all but one to be without merit. With respect to assignment of error number 7, for the reasons I give hereinafter, I would remand for an evidentiary hearing.

ASSIGNMENT OF ERROR NO. 7
Defendant's assignment of error number 7 concerns the refusal of the trial court to grant use immunity[1] to his wife Willene Mattheson so that she could testify in his defense without fear that her testimony would be used against her in her then pending trials for armed robbery and first degree murder growing out of the same events which formed the basis for the charges against defendant.
The importance of the testimony of Mrs. Mattheson to defendant's case can best be illustrated by a recitation of facts regarding the incident. Among the state's witnesses during its case-in-chief were eight women who were in the Hair Wiz at the time Ms. Dupaquier was shot. Most of these women, however, did not see the shooting or the events leading up to the shooting. All but one of them testified that they first became aware of the problem by hearing a loud noise or explosion. Two of the women said that they saw the victim fall after their attention was drawn to the reception area by the noise. One woman did state that she was looking in the direction of the reception area at the time of the shooting. Her testimony, however, does not relate any sequence of events which preceded the shooting. Rather, she said that she saw the events "all together." In response to the questioning by the prosecutor, the witness replied that she did not see Ms. Dupaquier lunge at defendant or move at any time prior to being shot. The state also called as a rebuttal witness another woman who saw the shooting. This witness testified that she did not see Ms. Dupaquier grab the gun and the victim was not moving at the time of the shooting. On cross-examination, this witness admitted that her attention was more on defendant than on the victim.
There is no testimony regarding where this last witness was in relation to the immediate vicinity of the shooting. According to the witnesses who were in the beauty shop, the working area is located up a few steps from the level at which the receptionist was working. Consequently, people on the upper level might have a distorted or incomplete view of what occurs on the lower level. The earlier witness who testified that the victim did not grab the gun was on this upper level giving a customer a permanent wave when the victim was killed.
Defendant's wife was at his side at the time Ms. Dupaquier was shot. In this position she would be the person best able to observe the sequence of events which culminated in the shooting. Furthermore, she was with defendant before he entered the Hair Wiz and would know whether and the extent to which he was intoxicated and any other matters possibly pertinent to defendant's preconceived plan concerning the armed robbery. Defendant called her as a witness.
Mrs. Mattheson gave her name and said that she was the wife of the defendant. When asked whether she was with defendant on March 9, 1978, Mrs. Mattheson conferred with her attorney and then replied: "Under the advice of my attorney, I take the Fifth Amendment." Following a few more questions which the witness refused to answer under the protection of the Fifth Amendment, defense counsel asked that the jury be excused so that he might argue defendant's Sixth Amendment rights to the judge.
The jury was removed from the courtroom and defense counsel suggested that the court provide use immunity for Mrs. Mattheson so that whatever testimony she gave could not be used against her during her forthcoming trials. When the judge refused, defense counsel called Mrs.
*1171 Mattheson's attorney to the stand (still out of the presence of the jury). Mrs. Mattheson's attorney was asked whether it was his opinion "as an attorney that the testimony that Mrs. Mattheson would give to the Court in reference to whether or not there was an intent, a preconceived design to kill Mrs. Mamie Dupaquier, would be excuplatory as to her husband?" The attorney responded that such was his opinion and that he had in the past characterized the testimony as "critical."
Defense counsel asked the witness' attorney whether it was not true that Mrs. Mattheson wished to testify but was invoking the Fifth Amendment only on his advice. Mrs. Mattheson waived the attorney-client privilege so that her attorney could answer this question. Following the waiver, the attorney answered that initially Mrs. Mattheson had said that she did not want to testify, but that "later she changed her mind and became indecisive." At no time, however, did Mrs. Mattheson express an affirmative desire to testify, according to the attorney.
Sometime after this defendant's trial, Willene Mattheson was tried on seven counts of armed robbery arising out of the same incident and was acquitted on all counts. On September 15, 1978, a little over three months after the conviction of Howard Mattheson for first degree murder, after failing to convict Mrs. Mattheson on the armed robbery charges, the state nolle prossequied the first degree murder charge against her.
At sentencing, defense counsel made an oral motion for new trial incorporating the same allegations upon which "bills of exceptions" were preserved during the trial. The record does not indicate whether the oral motion was followed with a written one. Nevertheless, the trial judge stated that he had already ruled on those matters at trial and found no reason to change the rulings. He therefore denied the motion for a new trial.
Article 439.1 of the Code of Criminal Procedure, relative to the authority to compel testimony from a witness, provides in effect that the Attorney General or district attorney may by subpoena initiate proceedings and secure a court order directing a given witness to give testimony upon that witness' being afforded immunity from the use by the state thereafter of such testimony or information directly or indirectly derived from such testimony, notwithstanding the witness' attempt to invoke the Fifth Amendment.[2]
Justice Lemmon, concurring in State v. Bice, 390 So.2d 1270, 1272 (La.1980), predicted *1172 that "this court will eventually be faced with the question of judicial authority to grant immunity to defense witnesses..." In my opinion, that case is this one, involving a jury recommendation of a death sentence. There could hardly be a more important case in which to consider the issue of immunity for a defense witness, a defendant's right to call witnesses, and due process.
The concept of judicially fashioned use immunity to enable a witness to testify for the defense is not without precedent, although until now this Court has never ruled on the issue. While there are admittedly those cases cited by the majority in which the court rejected the idea of immunity for a defense witness, I do not consider those cases dispositive as far as federal jurisprudence is concerned.
In any event, the United States Court of Appeals for the Third Circuit has held that there are situations in which due process requires that a defendant request and receive use immunity for a witness whose testimony will be exculpatory to the defendant, but might be incriminating to the witness. In Government of Virgin Islands v. Smith, 615 F.2d 964 (3rd Cir. 1980), that court remanded the case to the district court with instructions to determine whether deliberate prosecutorial misconduct had occurred in the government's refusal to request use immunity for a witness who supposedly had information which would exculpate certain of the defendants. If the lower court were to determine that the prosecutor had not behaved arbitrarily in refusing to request use immunity for the witness, the district court was instructed to use a balancing test to determine whether due process still might mandate a grant of use immunity to the witness.
The procedure established by Smith is that the defendant must apply to the trial court for use immunity naming the proposed witness and specifying the particulars of the witness' testimony. The witness must be available to testify and the defendant must make a convincing showing that the testimony will be clearly exculpatory and is essential to defendant's presentation of his case. Consequently, testimony that is merely cumulative will not qualify the witness for use immunity. Once defendant has made the threshold showing above, the court's focus shifts to a consideration of the countervailing interest of the state in not having use immunity granted to the proposed witness.
Smith presented a rather unusual situation. The witness for whom use immunity was sought was a juvenile under the exclusive jurisdiction of the juvenile authorities who were willing to grant use immunity to him. The juvenile authorities, out of prosecutorial courtesy, however, requested that the United States Attorney consent to the grant of use immunity, and that official for unexplained reasons did not concur. The proposed witness had made a statement to the police which inculpated himself in the crime and identified his co-perpetrators by nicknames which were not the nicknames by which three of the Smith defendants were known, rather, presumably, the nicknames of persons other than the three defendants. The testimony, therefore, was clearly exculpatory. The witness was an eyewitness to the crime and the court stated that "it would be difficult to argue that [his] eyewitness testimony ... would not be essential to the defense case." 615 F.2d at 974. The court noted that the United States Attorney could have little interest in opposing a grant of use immunity because that official had no jurisdiction to prosecute the witness.
The Smith court summarized the theories under which due process requires use immunity for a defense witness:
When the court finds prosecutorial misconduct by the government's deliberate intent to disrupt the fact finding process, it should order the government to grant statutory immunity to the defense witness or face a judgment of acquittal. In addition, even if there is no evidence of such prosecutorial misconduct, when it is found that a potential defense witness can offer testimony which is clearly exculpatory and essential to the defense *1173 case and when the government has no strong interest in withholding use immunity, the court should grant judicial immunity to the witness in order to vindicate the defendant's constitutional right to a fair trial. 615 F.2d at 974.
The Third Circuit based its holding upon cases by the United States Supreme Court which stress a defendant's due process right to present a defense. Among these cases is Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which holds that the government may not suppress exculpatory materials not known to the defendant. Suppression of such evidence violates a defendant's constitutional rights and requires a new trial when the evidence is such that it creates a reasonable doubt that did not otherwise exist. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
The United States Supreme Court pioneered the concept of judicially initiated use immunity in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), within the context of a defendant's Fourth Amendment right to be free from unreasonable search and seizure. The Simmons court held that an accused who admits ownership of property so that he may have standing to challenge its admissibility may not have his admission of ownership used against him during the guilt-phase of his trial. The Court found it "intolerable that one constitutional right should have to be surrendered in order to assert another." 390 U.S. at 393, 88 S.Ct. at 976.
Admittedly, Simmons does not address the situation before us where the constitutional rights being asserted are held by different individuals. However, I believe that it is necessary to accommodate the constitutional rights of both individuals, the defendant and his right to compulsory process, and the witness and his right to invoke the Fifth Amendment. A defendant's right to compulsory process is an empty one if a witness is permitted to invoke the protection of the Fifth Amendment and refuse to testify.
My reading of the record does not establish that the prosecutor's not granting statutory use immunity[3] was a prosecutorial abuse of discretion. It is and should remain the prerogative of the prosecutor to try co-participants in a crime in whichever order he chooses. However, he should not so fix the order of trial and not grant use immunity when use immunity is clearly required to assure a defendant's constitutional right to present a defense.
The grand jury charged defendant and his wife in a single indictment and pretrial proceedings were had jointly. Just over a month before trial, Willene Mattheson filed a motion to sever the trials and the trial court denied the motion two weeks before trial was scheduled to begin. The day before the scheduled trial, counsel for Mrs. Mattheson moved for a continuance because he was previously committed to a jury trial in federal court. At this point, the state severed the trials so as not to delay the trial against this defendant. Nothing about the order of trying defendant and his wife, the apparent seriousness of the charges against Willene Mattheson, or the status of the prosecutor's knowledge of her proposed testimony and its possible value to defendant suggests, nor do I imply, prosecutorial misconduct.
However, prosecutorial misconduct is not the only situation which should trigger a grant of judicially-fashioned use immunity for a defense witness. I agree with the United States Third Circuit Court of Appeals that there are occasions which require such immunity to enable a defendant to realize his due process right to present a defense. The balancing test proposed by that court in Smith is an excellent method for allowing both the witness and the defendant to assert their respective constitutional rights. The test as outlined by the *1174 federal court contains safeguards for both the witness who seeks to invoke the Fifth Amendment and the defendant who wishes to present exculpatory evidence via the testimony of that witness.
When a defendant wishes to have use immunity granted to a potential witness in his behalf, I would have him apply to the trial court naming the witness and specifying that the witness will be available. The defendant would have to make a convincing showing that the testimony of the witness would be clearly exculpatory and essential to the presentation of the defense case. The trial court would then have to determine whether indeed the witness would offer testimony which would be clearly exculpatory and essential to the defendant's presentation of his defense. If the court made the foregoing determinations in the affirmative, the court would then examine whether there were strong governmental interests which would countervail a grant of use immunity. I recognize that application of the procedure I propose would necessarily result in ad hoc determinations whether to grant or withhold use immunity for a potential defense witness. Nevertheless, I believe that due process requires guidelines for the proper consideration of a defendant's request.
The above procedure, of course, could not be given retrospective effect. In the case at bar, I would have us determine whether the effect of denying this defendant's request to compel the testimony of Willene Mattheson violated defendant's right to compulsory process. That determination would be hindered in the trial under review because the trial judge did not then have the benefit of the procedure I propose. Additionally, a post-trial evaluation of whether defendant was indeed seriously prejudiced is hampered by the fact that the nature of the proposed testimony is nowhere to be found in this record other than the conclusionary statements of Mrs. Mattheson's attorney that her testimony was clearly exculpatory and critical. Finally, now that she has been acquitted of armed robbery and the state has nolle prossequied the first degree murder charge against her, there can be no strong countervailing interest of the state which would weigh against a grant of use immunity to Mrs. Mattheson. Even if the witness can still be prosecuted for first degree murder on reinstituted charges, I am still of the view that the state's interest in avoiding the grant of use immunity to Mrs. Mattheson at her husband's trial is not great enough to offset this defendant's right to try to show that his conviction and death sentence were secured in violation of his Sixth Amendment right to present a defense by calling this witness in his behalf. This is a case in which the state sought and the jury recommended a sentence of death. If use immunity is granted, the state loses only the right to use against the witness in a later prosecution the inculpatory admissions and derivatives thereof, evidentiary matters of which the state does not have the benefit absent the witness giving the compelled testimony. I therefore would grant use immunity to Willene Mattheson so that she could testify at an evidentiary hearing, which I would order, on defendant's motion for a new trial.
Because the present record does not allow an intelligent assessment of whether the testimony of Mrs. Mattheson would be vital to the presentation of defendant's case, I would direct the trial court to hold an evidentiary hearing at which testimony would be taken from Willene Mattheson under a grant of use immunity. Should Mrs. Mattheson not be available to testify at the evidentiary hearing, her attorney could state, under this grant of use immunity for his client, what he understands her testimony would be if she were personally to testify. After such hearing, I would have the trial court determine whether due process requires that defendant be granted a new trial. In making this determination, the trial court would decide whether the testimony of Mrs. Mattheson is "material" in the sense that that word is used in Agurs, supra. In other words, I would have the trial judge order a new trial if he determined that had the testimony of Mrs. Mattheson been presented at defendant's *1175 trial there would have been created a reasonable doubt about defendant's guilt which did not otherwise exist. Needless to say, that ruling would be subject to review anew by this Court.
In summary, I would remand the case to the trial court for an evidentiary hearing on defendant's new trial motion. At that hearing, Willene Mattheson (or her attorney should Mrs. Mattheson be unavailable) would testify under a grant of use immunity. Following the hearing the trial judge would determine whether the testimony of Mrs. Mattheson was such that it created a reasonable doubt about defendant's guilt which did not exist without the testimony. If the trial judge determines that Mrs. Mattheson's testimony created such a doubt, I would have him order a new trial for defendant. I would reserve to defendant the right to seek review of an adverse ruling.
The majority has determined that defendant's right to a fair trial and right to call witnesses is subordinate to the witness' invocation of the Fifth Amendment. They have made this determination in a case in which defendant has had the death penalty recommended and notwithstanding that we can, even at this point in time, ascertain whether defendant's constitutional right to present a defense, and due process, have been prejudicially denied him, all without any real offense to the witness' Fifth Amendment privilege: by way of the procedure suggested in the discussion above.
For these reasons, I respectfully dissent.
NOTES
[1] The jury was, of course, at liberty to find second degree murder under La.R.S. 14:30.1(A) had they found a killing without specific intent to do so during the perpetration of the armed robbery.
[2] La.Code Crim.P. art. 798 provides in pertinent part:

It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
. . . .
(2) The juror tendered in a capital case who has conscientious scruples against the inflicting of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt;
[3] La.Code Crim.P. art. 798 was amended to conform with the decision in Witherspoon, wherein the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." (Footnote omitted.) On the other hand, the Court found no constitutional bar to excluding jurors who stated in advance of trial that they could not even consider returning a verdict of death or that their attitude about the death penalty would prevent them from making an impartial decision as to defendant's guilt.
[4] La.Code Crim.P. art. 439.1 provides:

A. In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a grand jury of the state, at any proceeding before a court of this state, or in response to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceeding is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self incrimination.
C. The witness may not refuse to comply with the order on the basis of his privilege against self incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be adjudged in contempt of court and punished as provided by law.
[5] The only federal appellate decisions ruling in favor of defense witness immunity appear to be the Third Circuit decisions of United States v. Morrison, 535 F.2d 223 (3d Cir. 1976), and Government of the Virgin Islands v. Smith, 615 F.2d 964 (3d Cir. 1980). In Morrison, a divided panel of the Third Circuit reversed the conviction on the ground that prosecutorial conduct had caused a defense witness to withhold testimony out of fear of self-incrimination. As a remedy for the misconduct, the court ordered that, upon a retrial, the government faced the choice of either granting the witness use immunity or having the defendant acquitted. Smith did not really involve a use of the due process clause to balance the public interest in withholding immunity against the defense need of it. In Smith, the prosecutor with jurisdiction over the witness was willing to grant use immunity. Opposition came from a prosecutor without jurisdiction. This was simply an instance of a prosecutor interfering for no apparent reason to suppress evidence that was about to become available to the accused. Thus, we consider that Smith and Morrison are distinguishable on their facts.
[6] In Sandstrom, the United States Supreme Court held that in a case in which intent is an element of the crime charged, the jury instruction, "the law presumed that a person intends the ordinary consequences of his voluntary acts," violated the due process clause of the fourteenth amendment's requirement that the state prove every element of a criminal offense beyond a reasonable doubt because the jury could have interpreted the challenged presumption either as "conclusive" or as shifting the burden of persuasion to the defendant to show that he lacked the requisite mental state for the crime.
[7] In 1952, defendant pled guilty to armed robbery and was sentenced to serve nine years in prison in Proceedings No. 554 in the district court for the County of Alfalfa, Oklahoma. In 1958, defendant pled guilty to robbery and aggravated assault and was sentenced to serve no less than twelve years nor more than fifteen years on the robbery conviction and three years on the aggravated assault conviction in Proceedings No. 22090 in the Superior Court, County of Hartford, Connecticut. In 1967, defendant was tried and convicted of robbery and sentenced to life imprisonment in Proceedings No. 67-2400 in the Criminal Court of Record, Dade County, Florida.
[8] La.Code Crim.P. art. 905.4(a).
[9] Id., art. 905.4(d).
[10] Id., art. 905.4(g).
[11] La.Code Crim.P. art. 851(3) provides:

The court, on motion of the defendant, shall grant a new trial whenever:
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
[12] Defendant's sentence review memorandum contains the argument, not designated as an assignment of error, that the trial judge erred in failing to inform the jurors of the consequences if they were unable to agree unanimously upon a recommendation. Relying on State v. Williams, 392 So.2d 619 (La.1980) (on rehearing), he urges that his sentence be reversed and the case remanded for a retrial on the issue of penalty. The record does not support defendant's contention. The jurors were instructed by the judge that if they were unable to unanimously agree on a recommendation of death, a sentence of life imprisonment without benefit of probation, parole or suspension of sentence was the "only sentence" that could be imposed. Moreover, no objection was made to this jury instruction. Also, unlike Williams, the jury never requested during its deliberation an instruction on the necessity of a unanimous verdict or the consequences of a non-unanimous verdict. Hence, defendant's argument is without merit.
[13] State v. Monroe, 366 So.2d 1345 (La.1978); State v. Parker, 372 So.2d 1037 (La.1979); State v. Culberth, 390 So.2d 847 (La.1980); State v. Jordan, No. 269-824, Criminal District Court, Parish of Orleans; and State v. Mattheson.
[1] A witness granted use immunity is only immune from the use of the compelled testimony or information derived from that testimony. The witness is not immune from prosecution or the use of evidence other than the compelled testimony or its derivatives.
[2] Code of Criminal Procedure Article 439.1 provides:

A. In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a grand jury of the state, at any proceeding before a court of this state, or in response to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceedings is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.
C. The witness may not refuse to comply with the order on the basis of his privilege against self-incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be adjudged in contempt of court and punished as provided by law.
[3] While there is not on the record an indication that defendant requested the prosecutor to grant use immunity to the potential defense witness, the prosecutor's silence, and his not acquiescing in defendant's request to the judge, makes it evident that he did not choose to grant statutory use immunity.