452 So.2d 1236 (1984)
STATE of Louisiana, Appellee,
v.
Solomon BIRDSONG, Jr., Appellant.
No. 16176-KA.
Court of Appeal of Louisiana, Second Circuit.
June 6, 1984.
Writ Denied October 5, 1984.
*1238 Wellborn Jack, Jr., Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Paul Carmouche, Dist. Atty., James G. Cowles, Catherine Estopinal, Asst. Dist. Attys., Shreveport, for appellee.
Before PRICE, MARVIN and SEXTON, JJ.
PRICE, Judge.
The defendant, Solomon Birdsong, Jr., has appealed his conviction for first degree murder, La.R.S. 14:30. We find no merit to the numerous assignments of error and affirm the conviction for the reasons assigned herein.
The charge against the defendant arises from the February 2, 1982, murder of Phyllis Bratton and armed robbery of a Pizza Hut restaurant in Shreveport. The defendant originally pled not guilty; but changed *1239 his plea to not guilty and not guilty by reason of insanity prior to his trial.
The events surrounding the murder are disputed in certain areas. However, it is undisputed that the defendant robbed the Pizza Hut and placed Phyllis Bratton in the walk-in cooler of the restaurant, fired two shots fatally killing Phyllis Bratton.
On the weekend preceding the murder, the defendant planned the robbery of the Pizza Hut with his brother, Philander Birdsong. Under the defendant's plan, Philander was to enter the Pizza Hut alone during a slack time of day and wait until no one else was present except himself and the single attendant. The defendant, who was formerly employed by the Pizza Hut, was aware that in the middle of the afternoon there was only one employee in the restaurant. According to the plan, Philander was to enter the store, produce their father's pistol, and then force the attendant into the walk-in cooler and close the door. Philander, who did not know where the money bags were kept, was then to signal the defendant to enter the store. The defendant was then to locate the money, take it, and leave while the attendant was in the cooler. However, the robbery did not go according to the defendant's plan.
Between approximately 2:30 and 3:00 o'clock in the afternoon of February 2, 1982, the defendant and his brother drove to the Pizza Hut in their father's 1979 maroon Thunderbird. It is disputed in the record the exact sequence of events of that afternoon. However, the record indicates that at some point after the defendant and his brother arrived at the Pizza Hut, the attendant, Phyllis Bratton, exited the outside door and saw the defendant sitting in his car.
Since the defendant knew Phyllis Bratton from his previous employment, the defendant entered the restaurant. At this point, it is disputed whether the defendant and Philander went into the store together, or whether the defendant went in alone, or whether Philander was already in the restaurant.
On the day of the defendant's arrest, the defendant indicated to the police that Philander had remained in the car while he and Phyllis Bratton sat in a booth in the restaurant. Two white males who were in the restaurant eating at that time, testified that they saw the attendant and the defendant sitting in a booth talking while there was another black male standing near the pay telephone in the Pizza Hut. The two white males testified that when they left the restaurant, the attendant and the defendant were still sitting in a booth and that the black male was still standing near the telephone.
The defendant had first indicated to the police that this black male by the telephone was a third person who had actually initiated the robbery. However, the defendant later indicated that the black male standing near the telephone was in fact his brother Philander.
In the defendant's confession upon his arrest, the defendant told the police that the third black male walked up to him and Ms. Bratton after the two white males had left, produced a gun, and told them that this was a robbery. The defendant stated that he then informed the man that he was at the restaurant for that purpose also, that he would tell him where the money was if he could participate. The defendant then stated that they walked Ms. Bratton to the back of the restaurant into the walkin cooler. After she was placed in the cooler, the man told the defendant that if he did not shoot the attendant he would kill the defendant's father.
At trial, the defendant stated that what actually happened was that when he arrived at the door his brother went in and waited while the two customers in the store were eating. The defendant indicated that the attendant came out during this interval, saw and recognized the defendant. The defendant stated that he then went inside the Pizza Hut and sat at a booth with Ms. Bratton while his younger brother stood milling around by the telephone. After the two customers left, the defendant attempted to signal his brother to abandon the *1240 robbery, but instead his brother walked up to him and the attendant, pulled out the pistol, and announced it was a robbery. His brother then marched both of them back, at gun point, to the cooler, put the attendant in the cooler, and pulled the defendant back stating that he was going to take him as a hostage. The defendant then told his brother to leave the restaurant and go back to the car. After his brother had left, the defendant then opened the cooler door, fired one shot hitting Ms. Bratton in the face and closed the cooler door. He then reopened the door again, saw Ms. Bratton moving, shot her again while she lay on the cooler floor. The defendant then located the money and exited the restaurant to the car where his brother waited.
The defendant discovered that he had left his keys inside the restaurant, returned to the restaurant breaking the glass door in his attempt to reenter, obtained his car keys and then he and his brother left the scene returning home.
On appeal, defendant asserts the following assignments of error:
(1) The trial court erred in refusing to prohibit the expert witnesses from expressing an opinion in their testimony before the jury as to the ultimate issue of the defendant's criminal responsibility, namely, whether the defendant was capable of distinguishing right from wrong with reference to the conduct in question.
(2) The trial court erred in appointing a Sanity Commission on motion of the State over defense objection, and refusing to order that defense counsel be permitted to be present during the examination of the defendant by that Sanity Commission, and in refusing to order that everything said and done during that examination be electronically recorded by a suitable non-obtrusive means.
(3) The trial court erred in refusing to grant use immunity to Philander Birdsong or to order the State to request use immunity for Philander Birdsong.
(4) The trial court erred in refusing to allow the defense to call the defendant and Philander Birdsong as surrebuttal witnesses.
(5) The trial court erred in refusing to give the defendant's requested special instruction that the jury could draw an inference adverse to the State from its refusal to request use immunity for Philander Birdsong.
(6) The trial court erred in overruling the defendant's motion to suppress.
SUPPLEMENTAL ASSIGNMENT OF ERROR:
(1) The trial court having once ruled that the expert witnesses could express an opinion as to the ultimate question of fact, erred in refusing to allow a defense psychologist, who was professionally reluctant to express such an opinion for ethical reasons, from expressing his opinion as a layman as to whether the defendant could distinguish right from wrong with reference to conduct in question.
ASSIGNMENT OF ERROR NO. 1
By this assignment, the defendant asserts that the trial court erred in refusing to prohibit the expert witnesses from expressing an opinion as to an ultimate issue of fact; i.e., whether the defendant was capable of distinguishing right from wrong with reference to the conduct in question.
Under LSA-R.S. 14:14, if the circumstances indicate that because of a mental disease or mental defect, the offender was incapable of distinguishing right from wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility. The determination of defendant's sanity is a factual matter reserved to the jury, derived from its evaluation of the evidence. State v. Roy, 395 So.2d 664 (La.1981). A defendant may rebut the presumption that he is sane and responsible for his actions by showing, by a preponderance of the evidence, that he was suffering from a mental disease or defect which rendered him incapable of distinguishing right and wrong with reference to the conduct in question. State v. David, *1241 425 So.2d 1241 (La.1983). Thus, the issue of whether the defendant was incapable of distinguishing between right and wrong is an ultimate issue for the determination of the jury.
Ordinarily, a witness can testify only as to the facts within his knowledge, and neither as to any recital of facts heard by him, nor as to any impression or opinion that he may have. La.R.S. 15:463. However, on questions involving a knowledge obtained only by means of special training or experience, the opinions of persons having such knowledge are admissible as expert testimony. La.R.S. 15:464.
The defendant asserts that the cases of State v. Wheeler, 416 So.2d 78 (La.1982), and State v. Montana, 421 So.2d 895 (La. 1982) established the rule that a qualified expert witness cannot express to the jury an expert opinion on an ultimate question of fact to be determined by the jury.
A threshold question in cases such as this, is whether expert opinion testimony is itself appropriate and whether the evidence is fact or opinion. In State v. Wheeler, supra, the supreme court found that in weighing whether evidence is fact or opinion, and whether it is admissible as expert opinion evidence under La.R.S. 15:463 and La.R.S. 15:464, the trial judge should consider three variables:
(1) the degree of concreteness of description or the difference in nearness or remoteness of inference;
(2) the purpose for which the testimony is to be admitted; and
(3) the potential for its classification as expert testimony.
As a corollary to the third variable, the court determined that two elements were needed to warrant the use of expert testimony:
A. The subject of the inference must be so distinctly related to some science, profession, business, or occupation as to be beyond the understanding of the average layman; and
B. The witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aide the trier of fact in his search for truth.
In the present case, the experts were asked to draw inferences from their testing and examinations of the defendant for the purpose of determining whether the defendant could distinguish right from wrong at the time of the crime. Therefore, the expert testimony constituted opinion evidence under the first and second variables of Wheeler. Under the third variable of Wheeler, the court should determine whether the two elements are met to warrant the use of expert testimony.
The subject of the inference which the experts were asked to draw does appear to be distinctly related to some science and profession to be beyond the understanding of the average layman. It would clearly be beyond the understanding of the average layman to interpret the various and numerous psychological tests done on the defendant. Additionally, each expert was shown to have sufficient knowledge and skill in the field of psychology or psychiatry to make it appear that their opinion or inference would aide the trier of fact in its search for the truth.
We also find that Professor Wigmore's test for receiving opinions of skilled witnesses to be a proper criteria to determine admissibility. Professor Wigmore found that:
... The only true criterion is: On this subject can a jury receive from this person appreciable help? In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject, and is not fixed or limited to any class of persons acting professionally.

7 Wigmore, Evidence, § 1921 (Chadbourn Rev.1978).
Applying the criteria to the present case it is apparent that the issue of the defendant's ability to distinguish right from wrong at the time of the crime is clearly a subject from which a jury can receive appreciable *1242 help from an expert psychiatrist or psychologist.
Next, it must be determined whether the trial court properly allowed expert testimony of the psychiatrist and psychologist on the ultimate issue of the defendant's ability to distinguish between right and wrong at the time of the crime. The defendant asserts such testimony amounts to an opinion on the very issue before the jury and thus, usurps the function of the jury.
State v. Wheeler, supra, involved the propriety of police officer testimony about marijuana transactions in the form of hypothetical questions. The court found that the officer was no more an expert than the jurors concerning the matters at issue in the case. The court additionally found that the officer's expertise failed to provide any assistance to the jury in reaching a decision. Therefore, the Wheeler case turned on the competence of the police officer to express an opinion as to the ultimate issue of the defendant's guilt.
In State v. Montana, supra, the Supreme Court again reiterated the suggested variables of State v. Wheeler. Montana also involved police officer testimony concerning drug dealers' method of operation. In Montana the bulk of the police officer's testimony was recitation of the characteristics of heroin dealers gleaned from the officer's experience. The court found that such a recitation was permissible.
The court in Montana found that the jury may couple the knowledge gained from the experience of the officer with the characteristics exhibited by the defendant, as established by the state at trial, and make an inference as to the ultimate issue of the defendant's guilt. On the other hand, that inference as to the ultimate issue of defendant's guilt is for the jury and the jury alone. When an expert ventures his opinion on that issue, he improperly usurps the function of the jury. The court in Montana found that the officer did this at the end of his testimony when he gave his own opinion concerning the guilt of the defendant.
In Wheeler, the court relied heavily on Professor McCormick's Evidence Treatise to justify retention of the ultimate issue rule. The court's statement that "it is believed that courts would exclude extreme expressions, even by a witness who has been qualified as an expert, on such matters as how the case should be decided" is a paraphrase of Professor McCormick's statement that "there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided... it is believed all court's would exclude such extreme expressions." State v. Wheeler, supra, at page 82. However, McCormick is not advocating exclusion of all expert opinion testimony upon an ultimate issue. On the contrary, he states that "the rule excluding opinion on ultimate facts in issue is unduly restrictive, pregnant with close questions of application and the possibility of misapplications, and often unfairly obstructive to the presentation of a party's case." McCormick, Handbook of the Law of Evidence, § 12 (E. Cleary, 2d Edition, 1972).
We find that both State v. Wheeler and State v. Montana should not be read as excluding all expert testimony on ultimate issues of fact. Both cases dealt with drug transactions in which the police officers' opinion as to the ultimate issue did not constitute special knowledge or training which would provide assistance to the jury in reaching a decision. In those cases, the officer was no more an expert than the jurors concerning the matter at issue. In the present case, the psychologist and psychiatrist testimony clearly does constitute special knowledge which would aid the jury.
Earlier decisions in common law states found that an opinion can never be received when it touches the very issue before the jury. In commenting upon this earlier rule, Professor Wigmore states as follows:
The fallacy of this doctrine is, of course, that measured by the principle, it is both too narrow and too broad. It is too broad, because, even when the very point *1243 in issue is to be spoken to, the jury should have help if it is needed. It is too narrow, because opinion may be inadmissible even when it deals with something other than the point in issue. Furthermore, the rule if carried out strictly and invariably will exclude the most necessary testimony. When all is said, it remains simply one of those impracticable and misconceived utterances which lack any justification in principle.

7 Wigmore, Evidence, § 1921 (Chadbourn Rev.1978).
We find particularly persuasive Federal Rule of Evidence 704. FRE 704 is now the rule in all federal courts and states which have adopted the Federal Rules of Evidence or the Uniform Rules of Evidence. Under FRE 704, testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. The advisory committee's notes on FRE 704 are particularly helpful in the present case. The committee noted that the basic approach to opinions, is to admit them when helpful to the trier of fact. In order to render this approach fully effective and allay any doubt on the subject, the committee stated that the so-called "ultimate issue" rule is specifically abolished by FRE 704.
We find that the rule excluding testimony on "the ultimate issue" to be unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. The basis usually assigned for the rule, to prevent the witness from usurping the province of the jury, is apply characterized as empty rhetoric. 7 Wigmore Evidence, § 1920 (Chadbourn Rev.1978).
In the present case, the defendant was tested at great length by each psychiatrist and psychologist who testified at trial. The inferences and conclusions to be drawn from those tests are clearly within the special knowledge and training of the experts. To not allow experts to express their opinions from the conclusions from those tests, even though it reaches an ultimate issue, would clearly deprive the jury of evidence which would be particularly useful in their determination of whether the defendant could distinguish between right and wrong at the time of the crime. By offering their opinion of whether the defendant could distinguish between right and wrong at the time of the crime, the experts were not usurping the function of the jury. The jury is free to reject the expert's opinion and accept some other view or determine for themselves the conclusions to be drawn from the evidence.
Having determined that the trial court properly allowed expert testimony on an ultimate issue before the jury, we find this assignment of error to be without merit.
SUPPLEMENTAL ASSIGNMENT OF ERROR
By this assignment, the defendant asserts that the trial court after having ruled that the expert witnesses could express an opinion as to the ultimate question of fact, erred in refusing to allow a defense psychologist, who was professionally reluctant to express an opinion for ethical reasons, from expressing his opinion as a laymen as to whether the defendant could distinguish right from wrong with reference to the conduct in question.
At trial, defense psychologist, Dr. Ron Goebel, expressed a reluctance to offer an opinion as an expert on the issue of the defendant's ability to distinguish right from wrong at the time of the crime. Dr. Goebel indicated that his reluctance was based on the position taken by the American Psychiatric Association's recommendation that experts in insanity cases refrain from expressing opinions on the ultimate questions of fact to be decided by the jury. Therefore, defense counsel requested that Dr. Goebel be allowed to offer his opinion on the issue as a layman.
In State v. Lott, 325 So.2d 576 (La.1976), the Louisiana Supreme Court reiterated the general rule as to lay opinion evidence on insanity found in State v. Swails, 226 La. 441, 76 So.2d 523 (La.1954). The Court in Lott found that it is well settled in this state and by the overwhelming jurisprudence *1244 of this country that a non expert witness, basing his testimony on facts and circumstances known to him, may be permitted to give opinion testimony touching upon the sanity or insanity of a person whose mental condition is at issue, provided the witness be shown to have had ample opportunity to observe the speech, manner, habits and conduct of such person.
Dr. Goebel testified he met with the defendant approximately three or four occasions for a total of eleven and one-half hours. Additionally, Dr. Goebel testified that he met with the defendant on all occasions in the Caddo Parish jail. Dr. Goebel met with the defendant on a purely professional basis in order to evaluate the defendant's psychological makeup.
The trial court found that the witness could not testify both as an expert and then testify as a lay witness. In this case, the trial court's ruling is correct in that the witness's opportunity to meet and observe the defendant was clearly limited to an expert, professional evaluation of the defendant's mental capacity. It was not shown that Dr. Goebel had ample opportunity to observe the speech, manner, and habits and conduct of the defendant, as per State v. Swails, in order to allow his opinion as a lay witness.
In determining that this witness failed to meet the criteria of a lay witness's testimony concerning the defendant's sanity, this court does not determine whether a lay witness who is competent to testify as a lay witness may testify concerning the ability of the defendant to distinguish between right and wrong at the time of the crime.
Having found that the witness was incompetent to form a lay opinion as to defendant's mental condition, we find this assignment of error to be without merit.
ASSIGNMENT OF ERROR NO. 2
By this assignment of error, the defendant asserts that the trial court erred in appointing a Sanity Commission on motion of the State over defense objection, and in refusing to order that defense counsel be permitted to be present during the examination of the defendant by that Sanity Commission, and in refusing to order that everything said and done during that examination be electronically recorded by a suitable non-obtrusive means.
In State v. Breaux, 337 So.2d 182 (La. 1976), the Supreme Court determined that a Sanity Commission examination is not a critical stage of the proceedings which dictates the necessity for the assistance of counsel. The Court found that to the contrary, a scientific examination must be conducted under controlled circumstances in an atmosphere considered by the examining physicians to be conducive to an inquiry into the defendant's mental condition.
In State v. Jones, 359 So.2d 95 (La.1978), U.S. Cert. denied, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708, the Supreme Court again held that a Sanity Commission examination is not a critical stage of the proceedings requiring the presence of counsel, if the Court in its discretion does not afford such presence.
In State v. Breaux, supra, the Supreme Court found that a defendant's right to a tape recording of the examination should depend entirely upon whether the particular physicians composing the Sanity Commission consider the recording of the examination to be in keeping with their practice. If they consider it advisable to include a tape recording as part of their report, it would be made available to the defendant as part of the report.
Since it is well-settled that the defendant had no right to assistance of counsel at the Sanity Commission examination, the sole determination is whether the defendant was entitled to have the examination recorded.
At the hearing on defendant's motion, held on March 28, 1983, the State indicated that it would have no objection to a recording of the proceedings and that it would additionally supply a video camera for that purpose as long as the State would have access to the films. Defense counsel, in response, stated that if a recording was made, the defendant did not want the district *1245 attorney to have access to the recording. The trial court denied defendant's request that the examination be recorded since the defendant's request carried with it the request that the film be provided only to the defense and the State not be granted access to the recording. The trial court did not make a determination as to whether the particular physicians composing the Sanity Commission considered the recording of the examination to be in keeping with their practice, as per State v. Breaux, supra.
The defendant asserts in brief that Dr. Richard Williams, a member of the sanity commission, testified that he received a history from the defendant that was contrary to the history given by the defendant to his experts and testified to by the defendant when he took the witness stand himself. Dr. Williams testified that the defendant told him that once the defendant assumed that his presence had been detected outside the Pizza Hut, he formulated a new plan to rob it. Defense counsel asserts that it was essential for his defense theory to show that the defendant was suddenly confronted inside the Pizza Hut with a situation which he had not contemplated or planned for. Therefore, the defendant asserts that an electronic recording of the examination of the defendant would have protected the defendant, and that such a recording could have been used to impeach or contradict the testimony of Dr. Williams.
However helpful a video tape may have been to the defendant for impeachment purposes, it seems that the defendant's request that only defense counsel be granted access to a proposed video tape was unreasonable. There seems to be no rationale in limiting the state's access to such a video tape especially since any inculpatory statements made by the defendant on the video tape would not be admissible into evidence. Therefore, we find this assignment of error to be without merit.
ASSIGNMENT OF ERROR NO. 3
By this assignment of error, the defendant asserts that the trial court erred in refusing to grant use immunity to Philander Birdsong or to order the State to request use immunity for Philander Birdsong. The defendant asserts that his younger brother, Philander Birdsong, was the only living eyewitness, other than the defendant, to what La.R.S. 14:14 describes as "the conduct in question" concerning his insanity defense. The defendant asserts that Philander Birdsong's testimony was absolutely essential to a full understanding of precisely what conduct the defendant engaged in at the Pizza Hut so far as it would shed light upon the defendant's state of mind at the time of the crime. When Philander Birdsong was called by the defense, he refused to answer any questions concerning that day by asserting his Fifth Amendment privilege against self-incrimination.
Prior to trial, the defendant filed a written motion for immunity for defense witnesses, seeking a court order requiring use immunity for Philander Birdsong. The Court refused to grant the defendant's motion.
There is no statutory authority for a Louisiana Court to grant a defense witness use immunity absent a request from the Attorney General together with the district attorney for the district in which the proceeding is or may be held.[1] Therefore, any *1246 judicially fashioned immunity must arise from the constitutional guarantees of compulsory process or due process. State v. Mattheson, 407 So.2d 1150 (La.1981), U.S. Cert denied, ___ U.S. ___, 103 S.Ct. 3571, 77 L.Ed.2d 1412.
In Mattheson, supra, the Supreme Court found that the Sixth Amendment does not support a claim for a defense witness immunity. The Court found that, traditionally, the Sixth Amendment's compulsory process clause gives defendant the right to bring his witnesses to court and have the witness' non-privileged testimony heard, but does not carry with it the traditional right to displace a proper claim of privilege, including the privilege against self-incrimination. The Court in Mattheson, supra, further found that § 16 of Art. I of the Louisiana Constitution of 1974 has not been construed to grant such a right.
Additionally, the Court in Mattheson found that it does not consider that the due process clause requires that defense witness immunity must be ordered whenever it seems fair to grant it. The essential fairness required by the Fifth Amendment guards the defendant against overreaching by the prosecutor and insulates him against prejudice. It does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges.
In the instant case, the defendant himself has indicated that his brother, Philander Birdsong, participated with him in the robbery of the Pizza Hut. State v. Mattheson, supra, found that a trial judge properly rejects a claim for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution. Here, Philander Birdsong is clearly a potential target of prosecution. Hence, the trial judge correctly denied defense witness immunity in this case. Therefore, we find this assignment of error to be without merit.
ASSIGNMENT OF ERROR NO. 4
By this assignment, the defendant asserts that the trial court erred in refusing to allow the defense to call the defendant and Philander Birdsong as surrebuttal witnesses.
Under La.R.S. 15:282, the prosecution has the right to rebut the evidence adduced by the defendant, but the defendant is without right to rebut the prosecution's rebuttal. The defendant asserts in brief that the defendant sought to recall the defendant to refute the testimony of Dr. Williams concerning the account of the events leading to the commission of the offense at different and significant aspects from the account testified by Dr. Williams to the jury. The defendant asserts that Philander Birdsong would have corroborated the defendant's testimony had he been granted defense witness immunity.
Clearly, the defendant is not entitled to rebut the prosecution's rebuttal. Additionally, it has already been determined that the State was not required to grant Philander Birdsong defense witness immunity.
Under La.C.Cr.P. Art. 765(5), the normal order of trial is as follows: the presentation of the evidence of the State, and of the defendant, and of the State in rebuttal. The Court in its discretion may permit the introduction of additional evidence prior to argument.
In the present case, it does not appear that the trial court abused its discretion *1247 in refusing to allow the defendant to present surrebuttal evidence. La.R.S. 15:282 clearly does not allow the defendant to rebut the state's rebuttal. The trial court properly refused defendant's request. Therefore, this assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 5
By this assignment of error, the defendant asserts that the trial court erred in refusing to instruct the jury of defendant's requested special instructions Nos. 5 and 6. The instructions stated that the jury could draw an inference adverse to the State from its refusal to request use immunity for Philander Birdsong. In place of the defendant's requested special instructions, the trial court instructed the jury with respect to La.C.Cr.P. Art. 439.1.
Requested special charge No. 5 is basically a consolidation of La.C.Cr.P. Art. 439.1 which indicates that only the State can grant immunity to a witness.[2] Defendant's requested special charge No. 6, states that "If the power to compel or produce the testimony of a witness lies exclusively within the control of either the State or the defense, and if either refuses to use that power, he may draw an inference that the testimony of that witness would have been adverse to the party that refused to use that power."
Special requested charges are governed by La.C.Cr.P. Art. 807 which provides that a special charge shall be given by the Court if it does not require qualification, limitation or explanation, and if it is wholly pertinent and correct. State v. Johnson, 438 So.2d 1091 (La.1983); State v. Lane, 414 So.2d 1223 (La.1982); State v. Toomer, 395 So.2d 1320 (La.1981). This charge, however, must be supported by the evidence. State v. Telford, 384 So.2d 347 (La.1980). This is a corollary of the trial judge's basic obligation under La.C.Cr.P. Art. 802 which obligates the trial judge to charge the jury as to the law applicable to the case. Under La.C.Cr.P. Art. 802, the trial judge is required to cover every phase of the case supported by the evidence whether or not accepted by him as true. State v. Simmons, 422 So.2d 138 (La.1982); State v. Miller, 338 So.2d 678 (La.1976).
Nevertheless, it is well-settled that requested charges which are already substantially given and covered by the trial court's general charge are properly refused. La.C.Cr.P. Art. 807; State v. Simmons, supra; State v. Matthews, 380 So.2d 43 (La.1980); State v. Mead, 377 So.2d 79 (La.1976).
Defendant's requested special instruction No. 5 which requests an instruction which is a summary of La.C.Cr.P. Art. 439.1 is covered by the trial court's general charge in which the Court read to the jury the entirety of Art. 439.1. Therefore, requested charge No. 5 is substantially covered by the trial court's general charge and properly refused.
With regard to special request charge No. 6, the trial court determined that it would not instruct the jury as to the inferences which might or might not be drawn with regard to the issue of the state's control of witness immunity pursuant to La.C.Cr.P. Art. 439.1. The essence of requested instruction No. 6 is to instruct the jury that they may draw an inference against the State for failure to exercise its power to grant immunity.
Since the state is not required to grant such immunity, there is no legal basis which supports the defendant's requested instruction No. 6. Additionally, the jury was well aware from its instruction concerning La.C.Cr.P. Art. 439.1 that it was solely within the province of the state whether to grant immunity to a witness. Therefore, it was to the jury to determine the weight to be given to such a fact.
Having found that the trial court properly denied defense requested jury instructions No. 5 and 6, we find this assignment of error to be without merit.
*1248 ASSIGNMENT OF ERROR NO. 6
By this assignment of error, the defendant asserts that the trial court erred in overruling the defendant's motion to suppress his confession to Shreveport Police officers on the basis that defendant did not intelligently waive his constitutional rights.
Before the State may introduce a confession into evidence, it must be affirmatively shown that it was freely and voluntarily given and not induced by threats, promises, or coercion. La.R.S. 15:451; State v. Neslo, 433 So.2d 73 (La. 1983); State v. Burkhalter, 428 So.2d 449 (La.1983); State v. David, 425 So.2d 1241 (La.1983). Where the defendant alleges police misconduct in reference to the statement, the State must specifically rebut these allegations. State v. Neslo, supra; State v. Serrato, 424 So.2d 214 (La.1982); State v. West, 408 So.2d 1302 (La.1982). Whether such a showing has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); State v. Benoit, 440 So.2d 129 (La.1983); State v. Lindsey, 404 So.2d 466 (La.1981), U.S. Cert denied, ___ U.S. ___, 104 S.Ct. 261, 78 L.Ed.2d 246. Where the accused is in custody, a prerequisite to admissibility of a confession is the advising of the accused of his constitutional rights and his intelligent waiver of those rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court's determination that a statement was free and voluntary is entitled to great weight and will not be disturbed unless it is not supported by the evidence. State v. Benoit, supra; State v. Lindsey, supra.
The testimony adduced at the motion to suppress hearing indicated the following facts which led the police to contact the defendant. During the investigation, Detectives Gary L. Pittman and D.E. Stevens did a background check on the victim, Phyllis Bratton. They discovered that in August of 1981, that a theft report had been filed by the manager of the Pizza Hut naming Phyllis Bratton and the defendant as two of several suspects in an internal theft. Additionally, during the course of their investigation, they interviewed Eva Taylor, another employee of the Pizza Hut. Miss Taylor indicated to the detectives that Phyllis Bratton had told her that day that Solomon Birdsong, Jr. had called and that he was going to come by the store. The detectives also found a missing person report filed by Solomon Birdsong, Sr. on January 19, 1982 in which the defendant's father reported the defendant missing and the defendant was listed as driving a maroon Thunderbird. The maroon Thunderbird was significant in that a maroon Thunderbird was seen at the rear of the Pizza Hut on or about the time of the armed robbery. The detectives then decided to go see Solomon Birdsong, Sr. to determine if Solomon Birdsong, Jr. was still missing.
The detectives arrived at the Birdsong home located on Venus Drive in Shreveport at approximately 6:30 a.m., February 3, 1982, the day after the robbery. The detectives testified that after knocking on the door, a young black male answered the door whom they later found out to be Solomon Birdsong, Jr., the defendant. The detectives then asked the defendant whether he had been at the Pizza Hut on the previous day. The defendant responded that he had been there around 3:00, that his brother was with him, and that he had talked to Phyllis Bratton while he was there. The defendant also indicated to the detectives that there was another black male in the restaurant at the time that he departed. This discussion took place in the Birdsong home with the two detectives, Solomon Birdsong, Sr., the defendant's father, and the defendant. The defendant's brother, Philander Birdsong, was in the home, but did not participate in the discussion. During this discussion, the detectives asked the defendant if he could come down to the police station in order to put together a composite picture of the other black male whom defendant stated was in the restaurant. Before leaving, the detectives asked Solomon Birdsong, Sr. if he owned a gun. He indicated that he did have a .32 caliber *1249 automatic pistol, which was the same type weapon used in the homicide of Phyllis Bratton. He led the detectives to the maroon Thunderbird in the garage and pulled out a .32 automatic pistol from under the front seat of the car.
At that point, the detectives advised the defendant of his Miranda rights, but indicated to the defendant that he was not under arrest. They then asked the defendant if he had killed Phyllis Bratton, and the defendant indicated he had not. The detectives then arranged with the defendant to meet him at the police station at approximately 8:00 a.m. that morning. They then left the Birdsong residence.
At the police station, Solomon Birdsong, Sr., the defendant's father; Solomon Birdsong, Jr., the defendant; and Lowell Birdsong, the defendant's uncle; met with the two detectives in the office of Det. Pittman. The detectives asked defendant if he was still willing to give the police a composite picture and also asked him if he could give the police a set of elimination prints. The defendant indicated that he would. At this point in time, the police officers obtained results from the Northwest Louisiana Crime Lab which indicated the first gun given to them by Solomon Birdsong, Sr. was not the gun used in the robbery. However, Solomon Birdsong, Sr. informed the detectives that he had another.32 automatic pistol and then handed that weapon over to the detectives. Det. Pittman testified that as he was walking with the defendant to obtain the elimination prints, he again advised the defendant verbally of his Miranda rights. The defendant at that time again indicated to Det. Pittman that he did not kill Phyllis Bratton and that the second gun was not the gun that had killed her. After the elimination prints were obtained, the detective and the defendant went back to the office of Det. Pittman. At that point, Sgt. Zimmerman called Det. Pittman and indicated to him that the defendant's print matched a print found on the cooler door handle where the body of Phyllis Bratton was found. The defendant had previously indicated to the detectives that he had not been near the rear of the store where the walk-in cooler was located. The detectives then took out a Miranda rights card and again informed the defendant of his Miranda rights. The detective then asked the defendant to read the card and sign the waiver on the card if he understood his rights. The defendant signed the card indicating that he understood his Miranda rights. The detectives then again asked the defendant to go over with him everything he had done that day. During that interview, the detective informed the defendant that his fingerprint matched the print found on the cooler and again asked him if he had in fact killed Phyllis Bratton. At that point the defendant did respond that he was the person who had shot and killed Phyllis Bratton. The detectives took out another Miranda rights card, read it to the defendant, advised him that he was under arrest for first degree murder and armed robbery and again asked him if he understood his rights. The defendant again acknowledged that he did and signed the card. During this interview with the defendant, the defendant's father, Solomon Birdsong, Sr., and his uncle, Lowell Birdsong, were present.
At that point, the detective again asked the defendant whether the second gun was the gun that he used to kill the victim. The defendant indicated that it was. The defendant then related to the detectives the events of the murder.
The defendant was again asked to restate the events of that day when Solomon Birdsong, Sr., stated that he felt that his son needed a lawyer and told his son to stop answering questions. The detectives then terminated the interview with the defendant.
A review of the facts in the record adduced at the motion to suppress hearing indicates that the defendant's confession was given freely and voluntarily while the defendant was fully advised of his constitutional rights. The record also reflects that the defendant intelligently waived his constitutional rights as per Miranda v. Arizona, *1250 supra, and the trial court's determination that the statement was free and voluntary was fully supported by the evidence. Although the defendant argues in brief that the police used trickery and deceit in obtaining the defendant's confession, the motion to suppress hearing record does not support the defendant's allegation. Therefore, we find this assignment of error to be without merit.
Having reviewed the defendant's assignments of error and found none to have merit, the defendant's conviction for first degree murder is affirmed.
AFFIRMED.
NOTES
[1] Art. 439.1. Witnesses; authority to compel testimony and evidence

A. In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a grand jury of the state, at any proceeding before a court of this state, or in response to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceeding is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self incrimination.
C. The witness may not refuse to comply with the order on the basis of his privilege against self incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be adjudged in contempt of court and punished as provided by law.
[2] Id.